# William Henry Giberson *v.* Patterson Mills Company, Appellant.

*Practice, C. P.—Trial—Evidence—Testimony of witness at former trial.*
At the second trial of a cause the notes of testimony of a witness called for the defendant at the first trial may be read in evidence at the instance of the plaintiff, if it appears that the witness is out of the state and could not be subpœnaed, and the defendant makes no objection to the correctness of the notes, and does not state that if the witness were present he would add anything to or in any degree qualify his former testimony.

*Negligence—Master and servant—Vice principal—Defective appliance.*
In an action by an employee against his employer, a corporation, to recover damages for personal injuries, the case is for the jury where the evidence tends to show that the general superintendent of the defendant directed the plaintiff to work at a defective hanger; that the superintendent knew that there were a number of defective and condemned hangers in the room from which the hanger in question was taken; that he himself selected the hanger; that the hanger had been recently painted; and that the paint to some extent had covered the defect.

VOL. CLXXXVII—33

Argued February 7, 1898. Appeal, No. 235, Jan. T., 1897, by defendant, from judgment of C. P. Delaware Co., Dec. T., 1894, No. 114, on. verdict for plaintiff. Before WILLIAMS, Mc-COLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass for personal injuries. Before CLAYTON, P. J.

The facts appear by the charge of the court below, and by the former report of the case in 174 Pa. 369.

At the trial the plaintiff offered in evidence the notes of testimony of Newlin Trainer taken at the first trial. The defendant objected because no efforts had been made to produce the witness. The court admitted the testimony on the ground that the witness was out of the state, and could not be subpœnaed. Exception and bill sealed. [1]

The court charged as follows:

This is not a very clear case so far as the testimony is concerned, and I think the principles of law involved in it will be easily understood. The difficulty you will have will be with the testimony. [It may be stated as a general proposition of law that every employer should provide a reasonably safe place for his workmen or his laborers, reasonably suitable and safe tools and machinery, reasonably safe materials to work with and reasonably competent fellow-workmen, and if inexperienced workmen are employed it is his duty to instruct them that the work in which they are employed is dangerous. Now, so far as I am able at present to remember, these are the only duties which the law throws upon an employer, and if he neglects any of them and an accident results by which an injury is inflicted upon any of his workmen, the employer is liable to respond in damages.] [2] So, you see, the very essence of the case that you are about to dispose of is whether the employer here was guilty of any negligence in the performance of any of the duties which I have enumerated. It is not necessary that there should be wanton, wilful or gross negligence; that is not necessary. Negligence is the absence or the want of due and proper care; and what is due and proper care depends largely upon the surrounding circumstances, the business that is being prosecuted, the tools that are being used and the danger that is incident to the business; these are all to be considered. [The

defendant is a corporation, that is to say, it is an artificial person. In its aggregate capacity it is liable to the same extent as if it was one individual person. A part of the difficulty in the cause arises from the question of agency. It is easy to bring a want of knowledge home to an individual; it is sometimes difficult to bring it home to a corporation. Still, it has no immunities that an individual has not. Corporations act by their agents and by their officers. Now, there is a distinction between an employee in a general sense of the word who works for wages, and an officer of a corporation who is financially interested in it as a stockholder, who acts as its manager and general superintendent, who hires and discharges workmen and pays wages; and he is generally compensated for what he does by a salary. If you find, therefore, that Mr. Davis was the general superintendent of the whole business, and that he was the general manager of all the machinery, then, I charge you that he was not, technically speaking, a mere agent; he was the vice principal, or stood in place of the principal; this is what the law calls a vice principal as distinguished from a mere agent. Now, understand me, if you find from the evidence that Mr. Davis was the general superintendent of the whole business, and was the general manager of all the machinery, then, I charge you that any want of care in him, any negligence of duty, is a want of care and negligence of duty in the corporation, because he is the vice principal of the corporation; the corporation is the principal. A general manager is not the mere agent; he is the vice principal, and stands in the place of the corporation.] [3] Then, we come down to a repetition of the first question, as to what was his first duty. [It was the duty of the corporation, and if you find he was the general agent of the machinery and superintendent, then it was his duty, and his duty was the corporation's duty, to furnish reasonably safe tools and machinery for the workmen employed by that corporation, and the great question will be, has he done it? If he has not done it then his principals or the ones he represents, that is the corporation, are liable if the accident was the result of that negligence.] [4] Now, in order to dispose of that question, you may say what did he do, and what did he neglect to do? Upon this question, the evidence is very meager, very unsatisfactory; very indeed. It is by no means clear, and much will depend on

inferences and presumptions, but let me say to you, gentlemen, you are not permitted to guess at anything; all your findings must be based upon the testimony. You may draw inferences, but you will not be permitted to guess at results. It seems that the plaintiff here was ordered, together with Mr. Taylor, another workman, to put up two hangers for a countershaft, and arrange the pulleys upon it. He said it weighed some two or three hundred pounds. The shaft of course would hardly weigh that much, but there were pulleys; they appear to be attached to the shaft which, of course, increased its weight. The plaintiff tells you that he and Taylor went down in the room below and took down two hangers that had been in use there. He says that he went to his dinner, and when he came back he found what he supposed was the hangers he had taken down, in the place where they were to be put up, and that a scaffold had been built some seven feet above the floor, and some three or four feet from the joists or girder to which the hangers were to be attached. It seems that while the plaintiff was at dinner Mr. Davis countermanded the order for the hangers that had been taken down below, at least, we may presume that he did; there is no evidence what he said, but there is evidence that Mr. Davis and Mr. Taylor went with him to a place where some old hangers had been stored, and that two of them were selected and brought up and put upon the platform. These hangers were put up by these two workmen, and after they had been put up, and as the workmen were about leaving, one of them broke, either from the weight of the shaft, or because of some unskilful work upon the part of Taylor and the plaintiff, or because of some defect in the hanger. Now, if that breaking was caused by any unskilful work upon either the part of the plaintiff or his coworkman, Taylor, there can be no recovery here, and I want you to particularly remember what I say upon this subject. If you find from the evidence that the cause of this accident was the screwing up of set screws too tight, either by Mr. Giberson or by Mr. Taylor, his fellow workman, then the company is not responsible either for the unskilful work of the plaintiff himself or for any unskilful work upon the part of his fellow-workman. Now, remember that, gentlemen; and that will be one of the questions for you to decide. I would advise you to take up that question first

of all, because it may relieve you from further trouble in the case in construing the evidence. Let me repeat again, because it is one of the turning points in the cause, after considering that question by the evidence, if you come to the conclusion that the cause of this accident was the screwing up of the set screws too tight, by which the hanger was broken, then the plaintiff cannot recover, because it is a settled principle of law that the negligence of a coworkman or negligence in the workman himself causing the accident cannot be charged to the employer.

Now, you come to the second question in the case, the more delicate one. If you come to the conclusion, under all of the evidence, that the accident was not caused by want of care or skill in putting up the machinery; if you find that it was not caused by screwing up the set screws too tight, but that it was caused by some latent defect, or some patent defect, in the machinery itself, then you naturally come to the second question, and that will be whether the defendants knew or ought to have known that there was a defect in that hanger; and [I here charge you again that Mr. Davis's knowledge was the company's knowledge, if you find that he was the general superintendent and manager of the machinery. Then, if you should come to the second question, you will look at all the evidence upon that. You have heard the testimony in the case as given by the witnesses in regard to the appearance of the iron. Some of them say it was broken all the way across a half inch thick and dark; some say it was broken on the outside, and some say they think it was on the inside, some of the witnesses say there was a sand blister there, the size of a three cent piece, and a crack on each side, but that it did not extend as far as the others say. Some examined it, perhaps, more closely than others did. If you come to the conclusion, therefore, that this was a piece of machinery that ought not to have been used without a further inspection of it, then, if you find evidence enough upon that subject, and find that that was the cause of the accident, you may find for the plaintiff.] [5] [Now, what is the evidence? I say, it is not satisfactory or clear. I am not prepared to say whose fault it was that it is not satisfactory or clear. It may be the fault of the law, because the law, as it now stands, does not permit the plaintiff to give in evi-

dence declarations that were made after the accident. It may be the fault is in the defendants in not producing more evidence in regard to the inspection of it. It is certain that the plaintiff has produced all the evidence that the law will permit him to produce, and I say it is not clear and satisfactory.] [6] The evidence is this: It appears that there was an old part of the mill which was called the Keystone, as near as I can ascertain from the testimony, which had either been rebuilt, torn down or repaired, it is not very clear which, and that some hangers that had been used in the old Keystone mill had been stored away in a part of the mill now being used, and that they had been there for many years. If I am not mistaken, Mr. Taylor says they had been there for many years. I think that Mr. Trainer says also that they had been there for a long time. He says that Mr. Davis was the general manager of the machinery; "I had nothing to do with that, if he was present; he was general superintendent of the mill; he did not buy goods." Now, that is what Mr. Trainer says Mr. Davis's position was. He says he was general manager of the machinery, general superintendent of the mill, could hire and discharge workmen, but did not buy goods. He had the right to discharge the men. [Now, Mr. Johnson asked him if he knew what became of their condemned hangers. Now, this is evidence that there are condemned hangers around there. This is some evidence at least that all the hangers around there are not in good condition; that there are condemned ones; it is evidence that they had examined and condemned them. "Q. Do you know what became of your condemned hangers? A. No, sir; they are thrown in the pile and sold. Q. You do not know that this hanger had been condemned? A. No, sir; I do not. Q. Did you ever hear of that before to-day? A. No, sir; it is entirely new to me. If you will allow me I will say what Mr. Davis said." But that of course he could not do. "Q. Do you know whether or not any of the twenty-two hangers—?" Now, this is important testimony, gentlemen, it seems there were about twenty-two hangers in that apartment that were never used. "Q. Do you know whether or not any of the twenty-two hangers which Mr. Taylor took down, do you know whether any of them were condemned or not?" He says, "I thought not. Q. Did you know that they were thrown away? A. I remember seeing

some but the most of them were good." This would indicate from Mr. Trainer's testimony that they were not all good. "Probably one half of them." Now, what does he mean? What hangers does he refer to? It will be for you to say. I say the testimony is by no means clear. If Mr. Trainer were here perhaps he could explain it. They are talking now about some twenty-two hangers. I suppose, it will be for you to say, that they are referring to the hangers that were in that apartment unused, and Mr. Trainer says, "most of them were good, probably one half." Now, if only one half of the hangers in that room were fit for use, it was the duty of Mr. Davis, as superintendent and general manager of the machinery, to know that, and if they went to that apartment and selected hangers that were not fit for use without properly testing them or examining them, it would be some evidence of negligence upon the part of Mr. Davis, and if it were negligence upon his part it was negligence upon the part of the defendant, and if it were not for that testimony in the cause I would feel it my duty to withdraw this case from you and say that there was not sufficient evidence; and I paid very close attention to the testimony. It strikes me that Mr. Taylor's testimony and Trainer's testimony does point at least toward some negligence in the selecting of those hangers, if you find that the hanger was defective.] [7]    [Now, there is another point to which I want to call your attention. I think that Mr. Taylor says that these hangers were painted twice within six months. He said they were painted once, I feel quite certain, within six months, and his testimony intimates that they were in that room where they went for them. Now, who painted them? Or why were they painted? If they were imperfect, and were painted by the direction of Mr. Davis, then, I say, if that painting was done without a close inspection, it was negligence. They had no right to paint the old defective hangers, if there were defective hangers there, without first inspecting them, and if they were not inspected before they were painted, it is clear the painting may have destroyed the ability of the workmen to see the defect. The workmen say that they looked over those carefully before they put them up, and saw no defects, but they say they had been painted, and I understood Mr. Taylor to say that they had been painted within six months. Now, it

may be that he does not mean that, but it will be for the jury
to say.] [8]  Mr. Taylor says that in his judgment the hanger
was broken by the tightening of the screws; he says they were
all examined, and that he helped to do it. (The court here reads
from the witnesses' testimony in the paper-book.)  "Q. Do
you know whether it was the custom of the mill or not to ex-
amine the machinery up in the mill to see whether it was effect-
ive?"  I suppose that means "defective." He says "it was."
"Q. And do you know whether or not this hanger was exam-
ined?  A. They were all examined.  Q. I understand your
judgment to be that that hanger was broken by tightening of
the set screws?  A. Yes, sir.  Q. What was the plaintiff's
business there?  A. Well, he says he was 'general carpenter.'
Q. After this hanger had been taken down in the storeroom
had it been used afterwards?"  Now what does that mean?  It
was, as I understand, a hanger that was taken from the Key-
stone factory and put down in the storeroom.  "Was it used
afterwards?"  He says, "I think not.  Q. Do you know
whether the hanger that broke had been condemned?  A. I
think not.  There was quite a number of them there."  I sup-
pose he means in the storeroom.  "Q. And you would be
most likely to know if it was afterward used?  A. Certainly I
should have known it.  Q. And you are the one that took
them up and down with the help from other men?  A. Yes,
sir."  That is, took them from the storeroom, I suppose he
means, up to the scaffold, or else he means he is the one who
took them from the old Keystone works and put them there;
I don't know which he means; it will be for you to say.
"Q. Mr. Davis was superintendent of the mill and he was
your boss as well as Mr. Giberson's?  A. Yes, I got my orders
from Mr. Davis.  Q. Where were the hangers before being in
the storeroom?"  Now, as I understand, the storeroom was a
part of the present factory?  Is that right?  (The counsel
answers yes.)

"Where were the hangers before being put in the storeroom?"
The answer is "The Keystone—" and then there is a dash.
"Where is that?"  Answer "At the east end of the mill, on
the third floor."  He could not mean that.  He could not mean
the Keystone factory is on the third floor of this mill.  There-
fore, there is evidently something left out.  He means that the

storeroom was in the east end of the mill on the third floor. Is that what you mean?

Mr. Broomall: The Keystone, there is no Keystone mill, that is the name of the storeroom.

The Court: Oh, is that so, then it means that.

Mr. Cockran: Was not the Patterson mill called the Keystone Mills?

The Court: That is what I thought, I don't know, gentlemen, you must get whatever light you can upon it. It may be that the Keystone, which was a small mill built by Mr. Patterson, stood on the site where this is now; that was the way I understood it. Now he goes on " How long had they been there?" He says, " I don't know." He means in this storeroom. " I don't know. I could not tell you anything about that. They might have been there ever since the mill was built. Q. Do you know how old the mill is? A. It was built in '61 or '62." That is thirty-two or three years that he says they might have been there. " What was the width of the shafting— " and then they go on to another question. I want to get down to where he speaks about the painting.

[Mr. Cochran: The painting is spoken of on page 22, if the court please, under the first court question there. (The court refers to the question in the paper-book.) " Q. Had this hanger been painted? A. Yes, sir. Q. How many coats of paint had it? A. About two, probably, not more than one. Q. Who brought the hanger from the shop to the mill? A. I can't say." There is more said about the painting than that. In the cross-examination, he says they were painted about six months ago. " Q. Now did you know at the time what had happened to them? A. No, sir. Q. How much of the hanger was up there; did you see the broken piece? A. I don't remember whether I saw it or not. Q. What did you do with the broken hanger? A. I took it down and throwed it in the scrap pile. Q. Did Mr. Davis throw it in the scrap pile? A. He certainly did. Q. You say this hanger had been painted twice; how recently before the accident. A. Probably six months."

Now this is an important piece of testimony. If these old hangers that had been stored away (they were in this storeroom) were recently painted, there should be some evidence here of their condition before they were painted. There should

be some evidence that they were inspected before they were painted. If you find that there was a defect in the machinery, if the painting itself had a tendency to conceal any defect in the hangers, then, if they were good hangers, what were they doing there? Why were they not used when the mill was built? Why were the hangers stored away? Why, I suppose you may presume they were stored away for an emergency, and were to have been examined, and believed to be reasonably good, and Mr. Trainer, if you put the same construction on his testimony as I do, says that probably one half of them were good, which would indicate that they were not all fit for use without a proper examination.] [9] Now, gentlemen, that is all the testimony that we have upon the subject of negligence. I say it is not clear, by any means; it is very unsatisfactory, but it will be for you to say what the testimony is, and if you come to the conclusion, after considering all the testimony, first, that this accident did not happen because of the unskilful setting of the machinery and a too tight screwing up of the set screws, but that it happened because of some defect in the machinery itself, that it was not able to bear the weight, and the wrench or weight of the countershaft which, according to the testimony, was 250 pounds, and that the weight of the countershaft alone broke it; that there was a flaw in it somewhere, if it was defective; but it was hidden so that it could not be seen, [then you will consider whether it could have been seen before it was painted, and if you come to the conclusion that Mr. Davis was the general agent and the general superintendent, you may infer that the painting was done by his direction, and if it was done on this defective machinery, it was his duty before it was painted to see whether it was perfect or not, for he could not see it if it was concealed by painting.] [10] If it was successfully used and unbroken before, he could take it for granted that it was good, and the law would not require him to make the same careful inspection as if it was a new piece of machinery, but the whole question will be for you, and I say to you, there is barely enough to submit the case to you. [And if you come to the conclusion, therefore, that there was some neglect of duty on the part of Mr. Davis, if you find that he was the general superintendent and manager, I charge you that his negligence was the negligence of the company, and that it is responsible for it,

that he was not a mere agent; that he was a vice principal, and that any negligence upon his part was negligence upon the part of the company. It is not the case of negligence upon the part of the foreman. A foreman is not a vice principal, he is an employee, a grade above a workman. If he were a mere foreman I would say to you that the company would not be responsible for his negligence and there could be no recovery for negligence upon his part, if he were a mere foreman, but he is more than a foreman, he is a subprincipal, and for that reason I hold that negligence upon his part was negligence upon the part of the company. And if you find from all of the evidence that there was negligence upon the part of Mr. Davis you can find for the plaintiff.] [11]

Verdict and judgment for plaintiff for $1,100. Defendant appealed.

*Errors assigned* were (1) rulings on evidence, quoting the bill of exceptions; (2–11) portions of charge as above, quoting them; (12) in submitting the case to the jury.

*Isaac Johnson*, with him *Wm. H. Harrison, Jr.*, and *Wm. B. Broomall*, for appellant.—The official stenographer's notes of the testimony of a witness, taken at a former trial of the same issue, are not a deposition, and, if the stenographer is not sworn, they are not properly proved notes of the examination as required by section 3 of the Act of May 24, 1887, P. L. 199: Smith v. Hine, 179 Pa. 203.

Under the circumstances, the defendant contends that Davis and Taylor, in selecting this hanger, were fellow-workmen of the plaintiff and that, being such, there can be no recovery; that while Davis might have been a vice principal for certain purposes, yet in the particular matter of the selection of this hanger he was a fellow-workman, and the defendant is not responsible for any lack of care on his part: Ross v. Walker, 139 Pa. 42.

There is nothing in the case to show that Davis knew anything about the hangers being defective. On the contrary, the only evidence upon that subject is that of Samuel Taylor, who says Davis and himself examined the hangers closely and saw no defect.

*A. A. Cochran*, with him *Albert Dutton MacDade*, for appellee.—The vice principal is where the master or superior places another in charge of his business or a distinct branch of it: Wharton's Law of Negligence, sec. 229; Lewis v. Seifert, 116 Pa. 628; N. Y., L. E. & West. R. R. v. Bell, 112 Pa. 400; Lehigh Valley Coal Co. v. Jones, 86 Pa. 439; Frazier v. Penna. R. R., 38 Pa. 104.

It was proper for the court to leave to the jury the fact as to whether Davis was a vice principal or a fellow-workman, and their verdict shows him to have been a vice principal: Hass v. Philadelphia & Southern Mail Steamship Co., 88 Pa. 269; Mullan v. Steamship Co., 78 Pa. 25; Evilhock v. R. R., 169 Pa. 592.

OPINION BY MR. JUSTICE McCOLLUM, October 17, 1898:

When this case was here before—174 Pa. 369—we held that the learned judge of the court below erred in admitting in evidence the declarations of Davis, the superintendent, to the effect that the hanger in question was, prior to the accident, condemned as defective. The objection to the declarations was that they were made several days after the accident and were, therefore, under a well-settled rule applicable to them, inadmissible in evidence for the purpose for which they were offered and received. In support of the rule above mentioned it is sufficient to refer to Railroad Co. v. Decker, 82 Pa. 119, and to the cases cited therein. We also held that the learned judge erred in his answer to the defendant's seventh point. The error in the answer was the omission of any reference to the effect upon the plaintiff's case of the unskilfulness or negligence of Taylor, his fellow-workman, in "adjusting the set screws too tightly—so much too tightly that the hanger was thereby broken." As there was some evidence in the case which afforded ground for an inference that the unskilfulness or negligence of the plaintiff or of Taylor in adjusting the set screws was the cause of the accident, the omission was regarded as important and misleading. We did not affirm the defendant's point, that "under all the evidence the verdict should be for the defendant," but upon the grounds, and for the reasons above stated, we reversed the judgment and awarded a venire facias de novo.

On the retrial of the case the declarations or statements of the superintendent were rejected, and the instructions to the jury in regard to the effect upon the plaintiff's claim of his own or his fellow-workman's unskilfulness or negligence in adjusting the set screw too tightly, and thereby breaking the hangers, were unobjectionable. The rulings upon the offers to show the declarations of Davis, and the instructions in regard to the effect of negligence on the part of the plaintiff or of his fellow-workman, were clearly in accord with the opinion of this Court on the appeal from the first judgment. It follows, therefore, that they are not subjects of criticism or complaint on the present appeal.

We discover no error in the admission on the retrial of the testimony of Newlin Trainer taken on the first trial. The only objection made to its admission was that the plaintiff had not made proper efforts to secure Trainer's attendance, and the answer to it was that he was not within the jurisdiction of the court. The testimony of Taylor taken on the former trial appears to have been read without objection. It may also be observed that Trainer and Taylor were called by, and witnesses for, the defendant on the former trial, and that the defendant did not question the correctness of the stenographic report of their testimony, nor intimate that if they were present they would add anything to or in any degree qualify it.

We agree with the learned judge of the court below that the evidence was sufficient to send the case to the jury. The testimony of Trainer, Taylor, Brumwell and Maxwell fairly warranted a finding that Davis was a vice principal, and that he knew or ought to have known that the hanger was defective. The defect was developed by the accident. It may have been and probably was the cause of the latter. It was not apparent to the workmen prior to the accident, because the painting of the hanger some time before covered or concealed it. There is nothing in the evidence which indicates that the hanger was used between the second painting of it and the occurrence in question. The testimony relating to these matters raised questions which it was the province of the jury, under proper instructions from the court, to decide. It only remains to be seen whether the excerpts from the charge furnished satisfactory or substantial ground for reversing the judgment. It is possible that

some of them, considered separately, may admit of criticism, but a careful examination of them in connection with the charge as a whole has not convinced us of reversible error.

Judgment affirmed.